NEW-YORK, March 1823.

The People vs. J. DeGraff.

---

## The People *vs.* Joshua De Graff. *Forgery.*

JOSHUA DE GRAFF was put to the bar charged with forging a note, purporting to be signed by J. T. & S. Elmore and also uttering it knowing it to be forged, on the 12th day of December, 1822. The note was drawn four months after

The crime of forging and passing a forged note,is to be made out from all the

facts of the
case: and it
is improper
to ask a wit-
ness, even on
the part of the
prosecuti o n ,
if it was not
his opinion
that the pris-
oner intended
to pay for the
goods purcha-
sed with false
notes.

Pleas of in-
sanity are to
be received
with caution.

date, and was for the amount of $619 76, with interest.

The facts of the case appeared as follows: De Graff, who resides at Esopus, in Ulster County, came to the City of New York, and called into the store of Mr. Zachariah Griswold on the 12th of December 1822, and purchased a quantity of goods, for the payment of which, the note was given. He asked Mr. Griswold if his brother, one of the Elmores, had purchased any goods of him; having previously informed Mr. Griswold that he was one of the firm of J. T. & S. Elmore. Mr. Griswold informed him he could not recollect. He then inquired if Mr. Griswold ever sold goods on a credit, and was answered that he sometimes did; and then informed him that he wanted to purchase a quantity of goods, for which he would give him a note of the firm, at four months, and offered Mr. Griswold a reference as to the standing of the house of J. T. & S. Elmore at Esopus, of which house, he alleged, he was one of the partners. He mentioned the names of the Messrs. Haights of this City, who knew the house, and who would be able to answer any inquiries in relation to it. Mr. Griswold called upon the Messrs. Haights, and ascertained the standing of the house of J. T. & S. Elmore to be good, and then told the prisoner he might select the goods, and give the note of the firm at four months. The goods were selected, and the note given. They were put up, and sent on board the Kingston Packet, in the usual manner.

The prisoner also came into the store of Mr. Wood, and represented himself to be one of the firm of J. T. & S. Elmore, and purchased goods to the amount of $729 54, on a credit. The prisoner referred to the Messrs. Waites. Shortly after the goods were obtained, the fraud was discovered by Mr. Wood. It was found that the prisoner was

not one of the firm of J. T. & S. Elmore, but that his real NEW-YORK, name was Joshua De Graff, who kept a store at Esopus, March 1823. a short distance from the store kept by J. T. & S. Elmore. The People Mr. Wood pursued the prisoner to Esopus, and obtained J. De Graff. the greater part of his goods, by a writ of replevin. The packages that contained the goods purchased of Mr. Griswold, had his initials marked on the cover, and by that means led to the discovery that De Graff had purchased goods of Mr. Griswold. Information was given, and De Graff was arrested and brought to the city.

It was proved, on the trial, that De Graff had heretofore sustained a good character; that he had for a number of years, kept a retail store in Esopus, and had a family of eight children, and that he was a man of some property.

The fact of forging the names of J. T. & S. Elmore, and also the receipt of the goods, and the circumstances, as before detailed, satisfactorily proved to the Court and jury.

*Griffin*, in order to make an impression in favor of the prisoner, asked the prosecutor this question: do you believe De Graff passed the note with intent to defraud?

*Maxwell* objected, and contended that the question was illegal, and that, if answered, was only the opinion of an individual, when the intent was to be ascertained from all the circumstances of the case. And the Court decided the question was illegal.

*Griffin* and *Price*, for the prisoner, rested their defence on his alleged insanity. They offered the testimony of Mr. Benjamin Dickinson, Caleb Burrell, and Henry Hammond, who testified, that they had been acquainted with the prisoner for a considerable length of time; that he had for the last six months, acted as if he was " shattered,"

NEW-YORK, March 1823.

The People
vs.
J. De Graff.

and conducted himself very "strange" that he was different from what he used to be.

Being questioned by *Maxwell, District Attorney*, upon what facts they supposed him deranged, replied,

1st. That he had of late been careless about his business.

2d. That he was not strict and regular in his religious conduct.

3d. That lately he had been in the habit of using profane language.

4th. That one of the witnesses had met him in a wagon, and he took no notice of him, although they had formerly been in the habit of speaking.

5th. That they thought his general conduct "strange."

It was proved by Mr. Griswold, that he selected the goods with great judgment and acuteness, and showed great management and art in his whole manner of obtaining them.

The case was summed up by *Price* and *Griffin*, for the prisoner. They contended that, from all the circumstances of this case, it was apparent that the prisoner was insane. He lived in the same town with the prosecutor; was well acquainted with him—must have known, if he was sane, the forgery would have been detected: he conducted himself openly, there was no secrecy about the goods, in putting them on board the packet, &c. He had, heretofore, borne an excellent character in the neighborhood in which he lived. He was also a member of the church and argued, from the greatness of the crime, that it was extremely improbable a man in his situation would voluntarily plunge himself into such a debt of guilt. They contended, that the law in relation to insanity, as laid down by able judges and writers, would include the case now before the Court, and cited the case of James Had-

field, and the authorities there referred to, (see Erskine's speeches,) where the law on this subject was ably considered, and allowed by the Court. They also cited 1 Hale, 33., and argued that it was often impossible. to detect a species of delusion the mind of man was sometimes subject to ; that it was so fleeting and volatile, as the cases referred to plainly proved, as often to baffle the most learned, and to confound the most preserving and intrepid ; that he had proved, by the testimony of a number of his neighbors, that his conduct for sometime past had been "strange ;" that they were unanimous in the opinion that he was "crazy ;" that, independent of the testimony of witnesses, the presumption of his insanity might fairly be inferred from the intrinsic circumstances of the case ; that, although he might not have made out his defence to the satisfaction of the Court, yet if there was but a doubt of his insanity, that doubt ought to be put in the scale of mercy—it ought to secure his acquittal, &c.

*Maxwell, District Attorney,* replied, by observing that it was an undoubted rule of law, that when a man sets up an exemption to answering for a crime, either by plea of insanity or otherwise, it lies upon him to prove it.— And that it had always been held that a defence of this kind was to be received with great caution. It was the duty of the prisoner to lay such a case before the Court and jury, as to afford a probable and reasonable ground for his defence. It was a defence extremely uncertain, easily made, and sometimes difficult to be disproved. That he was compelled to say this kind of defence had become too common. That Hadfield's case, cited by the counsel, had no application to the one now before the Court ; that there, the case was totally different. Hadfield had been known for sometime to be deranged ; his derangement

NEW-YORK, March 1823.

The People
*vs.*
J. De Graff.

NEW-YORK.
March 1823.

The People,
vs.
J. De Graff.

could be traced to the wounds he received in the wars on the continent; it was apparent for some years before the act for which he was tried was committed; that Hadfield had received severe contusions about the head, and that his brain was affected by them: that no analogy could possibly exist between them and the case now before the court.

In this case no satisfactory evidence whatever had been laid before the court, to show the derangement of De Graff. It was true, these witnesses had been introduced to show him insane, but how had they done it? They testify, that, for the last six months, his conduct has been " strange ;" that he has neglected his business—that he is not regular in his religious conduct—that he uses profane language : that he took no notice of one of the witnesses as he passed him in a wagon, &c. These are the circumstances relied on by the counsel for the prisoner; that they were insufficient, was apparent to every person. It appeared by the testimony of Mr. Griswold, that he saw no indication of a defective mind ; he selected the goods with great judgment, and his whole demeanor was shrewd and acute. His conduct from the beginning to the end, was indicative of his criminal intent, and not of an unsound mind.

The court observed to the jury, that the law was as stated by the District Attorney, that they were to judge from all the facts of the case, whether the prisoner was insane or not ; for it appeared to be admitted by the learned counsel for the prisoner, that he committed the crime as charged in the indictment, but they alleged that he was insane at the time ; that pleas of insanity were to be examined with care and caution—they are easily made, and often were made by prisoners as a last resort, when every other hope of defence had failed ; and concluded by observing

that there were some circumstances to which they would direct their attention.

1st. He represented himself to be Samuel Elmore. He must have thought at the time that he would have been detected.

2d. He returned to Esopus, to his family, in the same neighborhood with the Messrs. Elmores.

3d. He denied to Mr. Wood that he purchased of him or any other person, but in his own name—saying he had often bought of him before.

4th. Mr. Wood followed him to Esopus, and on reclaiming his goods was sued for damages by De Graff.

5th. The testimony of Messrs. Dickinson, Hammond, and Burrell.

6th. His former good character, being a member of the church, &c.

There were other circumstances in the case, that were in favor of his being in a sound state of mind.

1st. He gave Mr. Griswold a reference to Mr. Waite, and Mr. Wood, a reference to Mr. Haight. An act of great caution and acuteness; for had he referred both gentlemen to the same house, it is probable he would have been discovered.

2d. He selected the goods with uncommon discretion and care; and obtained a long credit.

3d. He designates the vessel by which the goods were to be sent—where she laid—her name, &c.

4th. He objects to Mr. Griswold to give an acceptance in the city—knowing it would lead to his detection.

5th. He goes home in the Steamboat, and tells Burrell he would settle his account, and did not seem deranged.

6th. When Mr. Wood charges him with falsely obtaining goods in the name of the Elmores—sues for the goods.

NEW-YORK.
March 1823,

The People
*vs.*
J. De Graff.

7th. When the officer goes to arrest him, he is found from home, locked up in a bed-room.

8th. When examined, declines answering.

9th. Why are not his relations and physicians produced upon the trial?

The case was given to the jury under the above charge, and they returned a verdict of guilty, against the prisoner.

*Note.—Forgery is defined to be a false making or alteration of such writings as either at common law or by statute are its objects, with intent to defraud another. 2 East. p. 852.

A short and comprehensive view of the law relating to this subject will be considered in the following manner.

Forgery at common law.

Chitty, vol. 3, p. 780. 2 East, P. C. p. 853. 4 Blac. Comm. p.248. 2 Leach, 910.

Forgery at common law was only a species of fraud, and punishable as a misdemeanor. It was often intermingled with false personating to which it seems very closely allied. It was at one time doubted whether forgery could be of any other writings but those of a public kind. In Ward's case, 2 Ld. Raym. 1461, it was decided that forgery at common law might be committed of any writing whatever, by which another might be defrauded; and this case has been decided to be good law in this country.

By Statute.

See the statutes, and the decisions under them. Ea't C. L. p. 865. to 965.

In England, a great number of very penal statutes have been enacted by Parliament, defining the crime and declaring the punishment, and prosecutions in that country are always brought under one of those statutes: they have made the crime of forgery in almost every case capital. In New York, we have a statute, declaring what shall be forgery, and also fixing the punishment. Rev. L. vol. 1. p. 404.

Under these statutes, some of the leading principles that govern cases of forgery will be given.

With what intent the act must be done.

The very essence of the offence is the intent to defraud. But it is perfectly immaterial whether any person is actually defrauded or not. If the forgery appears to have been done with a view of gaining any

advantages to the party himself, or prejudicing a third person, it is   NEW-YORK,
sufficient. And in Briggs' case, 3 P. Wms. 119, it was held no ob- March 1823.
jection that the forgery was found, by a special verdict, not to have
committed for the sake of lucre or to defraud the party. 1 Campb.     The People
324. 2 Leach, 983. 1 New Rep. 92. Chitty, C. L. vol. 1. p. 387.   *vs.*
2 Stra. 747. 2 Ld. Raym. 1461.     J. De Graff.

In Simeon Van Houten's case, the court decided that evidence of a large
    sum of money being found in the trunk of the prisoner, was proper
    to go to the jury to show that he knew. the bills charged in the in-
    dictment to be forgeries. City Hall Rec. vol. 2. p. 73.

In William A. Coffey's case, on a trial for forging and uttering a counter-
    feit check, the intent was permitted to be shown by evidence, that
    the person had previously passed a check, not laid in the indictment,·
    acknowledged to be counterfeit. Ibid. vol. iv.· p. 52.

The making or alteration of an instrument, with a fraudulent intent, and    What false
    without authority, completes the offence, before any injury is sus- making or al-
    tained by any person. Nor is it necessary the whole instrument terations a-
                                                                  mounts to for-
    should be made fictitious : making an alteration, or erasure, in any gery.
    material part of a true instrument, whereby another may be defraud-
    ed, is a forgery ; a false signature to a true.instrument, or a real sig-
    nature to a false one, are forgeries. The alteration of the date of a
    .bill of exchange after acceptance, by which payment may be accel-
    erated, is a forgery, 4 T. R. 320. But the instrument must be false in
    itself; for if a man pass for another who is the maker or indorser of a
    true instrument, it is not a forgery, although he may be punished un-
    der the statute of false pretences, Chitty, C. L. vol. 3. p. 465. The
    instrument must bear a resemblance to that which it is intended to
    represent, but it is not necessary that it should be pecfect, or even
    a correct copy, it is sufficient if it bears such a resemblance as to im-
    pose upon mankind, although an individual skilled in that kind of
    writing would detect its fallacy. 2 East. P. C. 950. 1 Leach, 229.

NEW-YORK,
March 1823.

The People
*vs.*
J. De Graff.

The forgery of any writing, which may be prejudicial to another, is indictable at common law.   Addis. p. 33, 34.

Forgery of a name to an assignment of a bond is indictable, although there be no seal to the forged instrument ; as it gives a possibility to defraud.   Ibid.

A co-obligor may be guilty of forgery, in signing a bill given by himself and another.   But his having it in his possession, may be evidence of authority over it; and if there be no intention to defraud, it is not forgery.   Ibid.

If a merchant writes his name on blank pieces of paper, and entrust them with his clerk, for the purpose of having notes written upon them, and by false pretences obtain them of the clerk, and make upon them notes other than those for which they were intended, such fraudulent use of them is not forgery.   Mass. Rep. vol. 4. p. 45.

Evidence that a party, in whose favor an instrument is forged, was knowing and assenting to the forgery, will justify the jury in inferring that he procured it to be done, and be sufficient to charge him with forgery.   Ibid. vol. 10, p. 181.

A forged promissory note, with a forged indorsement, will support an indictment for forging the note merely.   Ibid. vol. 2, p. 397.

How far is it necessary the thing forged should be a valid instrument.

It is perfectly immaterial whether the counterfeited instrument be such as, if real, would be effectual to the purpose it intends.   If there is only a resemblance sufficient to impose upon those to whom it is uttered, or to the public generally, it is sufficient, whether the fraud be effected on the part to whom an instrument is addressed, or whose writing is counterfeited, or upon some third person who takes it upon the credit it assumes, is perfectly immaterial.   Chit. vol. 3, p. 462.

And it was decided, upon solemn argument, that a forgery in the name of a person who has no existence, is as criminal, and as much a forgery within the statutes, as if there was intent to defraud the individual whose hand writing is counterfeited, 1 Leach, 83.   The cases are explicit and satisfactory upon this point.   To put a false and fictitious name on a bill indorsed in blank, in order to circulate it with secrecy, is a forgery, 1 Leach, 215.   To counterfeit a power of attorney, purporting to be by the administratrix and daughter of a seaman who had no child at his death, is a capital forgery.   The forgery of an instrument purporting to be a last will, is taken as within the statutes, although the supposed testator is living, 1 Leach, 449.   The

fabrication of an order for payment of a sailor's prize-money is forge-
ry, though it is invalid as wanting the requisites required by statute.
2 Leach, 883. Forgery of a protection in the name of a member of
parliament, who was not so, is indictable.   Sid. 142.‾  So it has been
adjudged a felony within 5 Eliz. C. 14, to counterfeit a conveyance
with a wrong name, although the conveyance would have been void
if it was genuine. 1 Keb. 803. 3 Keb. 51.

But notwithstanding the validity of the instrument, if real, is immaterial,
it must not appear on its face, so that no one of common understand-
ing would give it credit.   Thus, it will not be a forgery to fabricate
a will of land, as attested by only two witnesses.  2 East T. C. 953.

The greater resemblance there is between counterfeit and true bills, the
greater the crime of passing and counterfeiting them.  City Hall
Rec. vol. 1, p. 100.

An instrument in writing, directing or requesting the payment of a spe-
cific sum in the bills of an individual, are not the subject of forgery
under the statute.  Ibid, vol. 2. p. 155.

An instrument forged to fall within the statute, must be such, that an ac-
tion might be sustained thereon, without recurring to extrinsic tes-
timony.   And an instrument upon which an indictment is predi-
cated, if created by statute, must be conformable to its provisions
Vol. 3, p. 59—65.

A paper, purporting to be a power of attorney, authorizing a receipt of
a pension due from the government to a wounded seaman, not under
seal, though forged, is not an instrument upon which an indictment
for forgery, under the statute, can be predicated.   Vol. 4, p. 163.

To constitute forgery, it is not necessary that the name of any person in
existence should be forged.  Vol. 5, p. 87, vol. 6. p. 25.

The person, whose name to an order for the delivery of goods, is forged,
should have a right to order their delivery ; for it seems a mere re-
quest in writing, to deliver an article, over which the drawer has no
control, is not an order for the delivery of goods, and to make such
instrumedt falsely, is not a forgery.

Forgery, under the act, cannot be committed, unless the note is payable
in money.  Ibid, vol. 1, p. 159. vol. 2, p. 155,

NEW-YORK,   At common law, forgery seemed more immediately confined to the ᶠᵃˡˢⁱ-
March, 1823.      fication of records, and other instruments of a public nature, and al-
                  so of private deeds and instruments under seal.  By the decision in
The People        Ward's case, 2 Ld. Raym. 1461.  It was held, after solemn argument,
    vs.           that forgery might be in respect of any writing whatever, by which
J. De Graff.      another might be defrauded    Chitty C. L. 3. vol. p. 780.

Of what in-
struments for-
gery may be   Our statute, defining and declaring the punishment of forgery, may be
committed.        found in Rev. L. vol. I. p, 404, and is most extensive in its opera-
                  tion, including almost every case.

              In the first section it is enacted, " that to make, alter, forge, or counterfeit
                  " or to procure to be falsely made, altered, forged, or counterfeited,
                  " any record, charter, deed, or writing sealed, will testament, bond,
                  " writing obligatory, bill of exchange, promissory note for payment
                  " of money, or any note or specialty for the payment of money, and
                  " expressed to be payable in any goods, wares or merchandises, en-
                  " dorsement or assignment of any bill of exchange or promissory
                  " note for payment of money, or any acquittance or receipt, either
                  " for money or goods ; or any acceptance of any bill of exchange,
                  " or the number or principal sum of any accountable receipt for any
                  " note, bill or other security, for payment of money, or any warrant
                  " or order for payment of money or delivery of goods, whether such
                  " order purports to be the order of the owner of the goods or money
                  " specified therein, or of some person who claims an interest in the
                  " same, or of any other person, with intention to defraud any person
                  " or body politic or corporate whatsoever, or shall utter or publish as
                  " true, any false, altered, forged, or counterfeited record, charter,
                  " deed, or writing sealed, will testament, bond, writing, obligatory, bill
                  " of exchange, promissory note for payment of money, or any note
                  " or specialty for the payment of money, and expressed to be paya-
                  " ble in any goods, wares, or merchandises, endorsement or as-
                  " signment of any bill of exchange, or promissory note for payment
                  " of money, acquittance or receipt either for money or goods, or any
                  " acceptance of any bill of exchange, or the number or principal sum
                  " of any accountable receipt for any note, bill or other security for
                  " the payment of money, or any warrant or order for the payment
                  " of mouey, or delivery of goods or money specified therein, or of

" some other person who claims an interest in the same, or of any " other person, with intention to defraud, &c. knowing the same to " be false, altered, forged, or counterfeited, &c.

See the following decisions under this section of the statute :

In Howell's case it was decided, that a check upon a bank is not a bill of exchange within the meaning of the act to prevent forgery and counterfeiting, but it is an order for the payment of money. 4 Johns. Rep. p. 296.

An order in the following words, " Mr. Seward, Sir, let the bearer trade thirteen dollars twenty-five cents, and you will much oblige yours, &c. August 16, 1809. Samuel Layton," is an order for the delivery of goods within the statute. 5 Johns. Rep. p. 236.

Forging an order in these words, " Pay to J. L., or bearer, fifteen hundred dollars in N. Myer's bills or yours," is not within the act to prevent forgery, it not being an order for the payment of money, or the delivery of goods. 6 Johns. Rep. p. 320.

In Finch's case it was decided, that forging a note in the following words, " Due Jacob Finch one dollar on settlement this day, February 7th, 1809, David Knight," is not within the statute. Ibid, p. 237.

It was decided, that forging a check in the following words, " Cashier of " the Exchange Bank, pay to ——— or bearer, in notes current at " the several banks in this city, fifty dollars, New York, 5th day of " February, 1817, Philip Hone," is not a note or order for the payment of money within the statute, nor can a conviction be sustained for passing it either under the statute or at common law. City Hall Rec. vol. 2, p. 47.

In Joseph Heath's case it was decided, that a forgery of the following order, " Mr. Ten Brock will oblige Mrs. Wells with the following ar- " ticles, 2 pieces of Irish linen, 18 yards of lutestring ribbon, &c. " Yonkers, March 31, 1817, Eliza Wells," was within the statute, although by a legal disability the party would not have been liable on such an order had it been genuine. Ibid, p. 54.

John Conner's case. The corporation of New-York authorized John Pintard, their agent, to issue bills, and he did so in this form, " The Cor- " poration of New-York promise to pay the bearer seventy-five cents " on demand, New-York, Dec. 26, 1814," and signed them with his own name ; it was held, on a charge for forging and uttering these

bills, that they were not promissory notes for the payment of money, within the statute. It must be such an instrument that an action may be sustained upon it, without recurring to extensive testimony. Ibid, vol. 3, p. 59.

In Grant and Hooper's case, it was decided, that it was unnecessary the name of any real person should be forged, nor is it necessary, either at common law or under the statute, that the name forged should be spelled right. The forgery of a check in the following words, is within the statute: " New-York, May 5th, 1818, Cashier of Phenix Bank " pay to Smith & Underhill, or bearer, one hundred and seventy- " five dollars, Thomas Bearbanks," although no person could be found in the City by the name of " Thomas Bearbanks," is within the statute. Ibid, vol. 3, p. 142.

The second section declares the crime of forging and counterfeiting any certificate or endorsement of the acknowledgment or proof of any deed, or recording of any deed or writing, or uttering the same as true, a felony. See the cases of Daniel Flanders and Samuel Harry. 18 Johns. Rep. p. 164. See also Peter Faulkner's case, City Hall Rec. vol. 3, p. 65.

The third section declares that counterfeiting, or to aid or assist in counterfeiting public securities, or uttering the same as true, shall be deemed felony.

The fifth declares that counterfeiting, or aiding and assisting to counterfeit any of the species of gold or silver coins now current, or hereafter to be current in this State, or shall pass or give in payment, or offer to pass or give in payment, knowing the same to be counterfeit, shall be deemed guilty of felony.

This section creates a new offence ; it enhances the misdemeanor, at common law, to a felony  See John Burk Murphy's case, City-Hall Rec. vol. 4, p. 42 : John J. Dorsett's case, ibid. vol. 5, p. 77.   It was decided, though a counterfeit coin be very unskillfully executed, still the offence is complete, if such coin be so far finished, and in such a state that it is calculated to deceive , and whether it is so calculated

or not, is a question to be left to the jury. Thomas Quin's and James Kegan's cases, ibid. vol. 6. p. 63.

The ninth section declares " that if any person shall have in his posses-
" sion or receive from any other person, any forged or counterfeit
" promissory note for the payment of money, with intention to utter
" and pass the same, or to permit, cause, or procure the same to be
" uttered or passed, with the intention to defraud any person or body
" politic, or corporate, whatsoever, knowing the same to be forged
" or counterfeited, then every such person being thereof convicted ac-
" cording to the due course of law, shall be deemed guilty of fel-
" ony."

Under this section see the following decisions,

Elizabeth O'Conner was indicted, under this section, for having in her
possession a counterfeit $3 note of the Franklin Bank. It was de-
cided by the Court that to sustain an indictment for having in pos-
session counterfeit bank bills with intention to utter them, it is nec-
essary for the public prosecutor either to produce the bills laid in
the indictment on trial, or to identify them with sufficient certainty
City Hall Rec. vol. 4, p. 62.

In Daniel Sarle's case, who was also indicted under this section, it was
decided that it was unnecessary to produce the charter of the incor-
poration of a Bank to prove its existence, or to call upon the officers
of the Bank to prove the forgery. Ibid. 107.

Elizabeth Conner indicted under the section for having in her posses-
sion, a $3 counterfeit bill on the Mechanics' Bank in the City of
New York. It was decided to constitute the possession of counter-
feit money, it need not be found on the person: it is sufficient if it be
under the control of the prisoner; and this may be inferred from the
circumstances. Ibid. vol. 5. p. 115.

In Hester Knapp's case, it was decided that passing a counterfeit note in
the following words: " The President, Directors and Company of
" the Montreal Bank, promise to pay B. Holmes, or bearer, twenty
" dollars, out of the joint funds of the Association, and no other.
" R. GRIFFIN, Cashier.            JOHN GRAY, Pres.
" No. 304.        A."
was within the ninth section of the act against forgery, &c. not-
withstanding it may not be a negociable note. Ibid. vol. 6.

NEW-YORK,    †For the doctrine relating to insanity, see case of Eliza Tripler    Ante,
March 1823.        page 48, and the authorities there referred to.

The People        But it is often a question how shall the insanity of a person  be proved ?
     vs.          It may be proved :
J. De Graff.              1.   By the inspection of the Court.   I. Hale, 33.
                          2.   By evidence before the jury.  3 Bac. Abr. 81.
                          3.   By a plea *ore tenus*—a venue may be awarded returnable
                          *instantur*, and an inquest taken, Fost. 46. Kel. 1 Hale, 35.    1
                          Lev. 61.

It was formerly held, that a madman might be punished as a traitor for
    killing or offering to kill the king ; but this strange principle of law
    has long since been exploded. See 2 Roll, 324. 3 Inst. 6. 4 Coke, 124.
    1 Hale, 36, 37.

In Richard P. Clark's case, it was decided that on the traverse of an in-
    dictment for felony, should the jury believe that at the time of the
    perpetration of the act  constituting the felony, the prisoner was ca-
    pable of distinguishing good from evil, they will be justified in finding
    him guilty, though it is proved he has been subject to derangement.
    City Hall Rec. vol. 1, p. 176.

In Daniel Selleck's case, it was held, that on the traverse of an indict-
    ment for murder, alledging that the death was occasioned by means
    of poison administered by the prisoner, and the ground of defence on
    the trial, is insanity.   Should the jurors entertain a reasonable doubt
    that the death was the effect of poison, it will be their duty to acquit ;
    but should the jurors doubt whether the prisoner was insane at the
    time of administering the poison, it will be their duty to convict.
    Ibid. p. 185.

Where insanity at a particular time is attempted to be proved, evidence
    of insanity immediately before or after the time, will be received ;
    but evidence of insanity long after the time, would not be admissable
    Mass. Rep. 9. p. 225.

The opinion of witnesses, whether professional men or others, are gener-
    ally inadmissable to prove the insanity of a person unless they be
    predicated upon facts testified to, either by them or other witnesses
    Ibid.   See also ibid. vol 3. p, 330, vol, 8, 371.